HAMLIN, Justice.
 

 This is an appeal from a judgment of the trial court awarding plaintiff $2,236.73, an amount alleged to be due on contract, and recognizing a lien in his favor affecting defendant’s
 
 [1]
 
 2%28ths interest in an oil, gas, and mineral lease on certain described property.
 
 [2]
 

 The following contract, signed only by plaintiff and his wife but admitted by defendant to be the contract between the parties, was executed in March, 1954.
 

 “Whereas, the undersigned, W. H. Blasingame, married to and living with Velma Blasingame, now owns the oil gas and mineral lease on the following described property situated in La Salle Parish, Louisiana, to-wit:
 

 “Southwest Quarter of Northeast Quarter (SW(4 of NEJ4) Section Thirty-two (32), Township Nine (9) North, Range two (2) East.
 

 “Which leasehold estate is subject to the usual one-eighth royalty reserved to the lessor.
 

 “And, Whereas, the undersigned, W. H. Blasingame as the owner of said oil, and gas lease, plans, on or before the 1st day of June, 1954 to commence operations for drilling a well in search of oil and/or gas on said tract, said well to be known as the Blasingame Flora Brooks # 1 Well.
 

 “Now, Therefore, we, the undersigned, W. H. Blasingame and wife, Velma Blasingame, herein called assignors, in consideration of furnishing a complete rig to drill the Brooks # 1 by H. R. Anderson, the receipt of' which is hereby acknowledged, whose mailing address is Gloster, Miss., and who is herein called assignee: do hereby grant, bargain, sell and convey unto the said assignee, his heirs and assigns an undivided Twenty nine one hundred & 28th (2%28) working interest in and to said oil, gas and mineral lease, and the leasehold estate created
 
 *510
 
 thereby, and all Tights and privileges granted therein.
 

 “To Have and to Hold the said undivided interest unto the said assignee his (her) (their) heirs and assigns forever.
 

 “It is further understood and agreed between the parties hereto as follows:
 

 “1. On or before J.úne 1, 1954, assignors agree to commence operations for the drilling of the said Blasingame Flora Brooks # 1 well, and to continue the drilling thereof with due diligence to a depth of 3,500 feet below the surface of the earth, unless oil or gas be discovered at a lesser depth. In the event drilling operations are not begun as herein specified, then the said W. H. Blasingame shall forthwith refund the amount recited herein to be the consideration.
 

 “2. If an oil and/or gas chalk or sand is encountered in the said well, which in the judgment of the said W. H. Blasingame might produce in paying quantities, then said assignee shall be furnished an itemized statement of the cost of labor, materials and equipment necessary to complete said well and place same on production. Assignee agrees to then promptly pay the undivided 2%28
 
 Vs
 
 part of the said cost of completion. Completion is intended to cover not only the completion of the well but all equipment necessary for' operating same. Adjustment between estimated and actual cost shall be made within a reasonable time thereafter.
 

 “3. If said well be a producer, said W. H. Blasingame or his designated agents, heirs or assigns shall proceed to operate same, and at the end of each month shall furnish an itemized statement of the cost of operation and maintenance to assignee, who agrees to promptly pay the undivided 2%28 part of same within ten days after receipt of said statement. The cost of damage insurance, bookkeeping, servicing and equipping the well shall be borne by assignee in the same proportion as the cost of operation and maintenance. Assignee, or his transferee, agrees to give written notice of any change of mailing address from that shown herein.
 

 “4. Assignors shall have a lien on the interest of assignee in said lease and well, the oil and gas produced therefrom, the proceeds thereof, and the material and equipment thereon, to secure the payment of any sum or sums due under this assignment.”
 

 Defendant complied with his obligation under the contract by furnishing a “Wilson” drilling rig. This rig is involved in the reconventional demand hereinafter referred to, which has been abandoned.
 

 
 *512
 
 The well was drilled and completed, and defendant was called upon from time to time to pay his pro rata of the expenses, which expenses were verbally recited to him by plaintiff. It is admitted by plaintiff that defendant paid $3,810 for which no bill was submitted.
 

 On or about November 19, 1954, defendant received from plaintiff a statement (his first) enumerating expenses due on the drilling of the well. From the total amount was subtracted the sum previously paid, leaving an alleged balance of approximately $1,900 owed by defendant. To take care of the amount alleged to be due by him, defendant issued two checks, one drawn to Lane Wells Company, a furnisher of services, for an unpaid account and one to plaintiff’s personal account.
 
 [3]
 
 Shortly thereafter, defendant stopped payment on the checks for the reason that he questioned the verity of the statement which had been submitted to him.
 

 In May, 1955, plaintiff filed suit against the defendant, praying for recognition of a lien under LSA-R.S. 9:4861 and 4862
 
 [4]
 
 and demanding judgment in rem covering the property provisionally seized in the sum of $2,463.29, together with $50 for preparation of the lien and 10% attorney
 
 *514
 
 fees plus interest. Alternatively, he asked for a personal judgment in the same amount. Named as a co-defendant was Martin S. Sanders, Jr., to whom Anderson had sold and assigned a Yieth interest in the lease- on March 1, 1955.
 

 Defendant and his assignee filed exceptions of no cause or right of action, which were referred to the merits, and answered in the form of a general denial. A reconventional demand was filed by the defendant in which he prayed for $6,750, an amount claimed to have been paid by him for additional use of the “Wilson” drilling rig he furnished on the well.
 

 The trial judge deleted from the account an item alleged to be due Wilkin L. Holmes for digging pits, constructing a road, and furnishing an erected derrick, holding that the work was completed before the assignment to defendant.
 
 [5]
 
 He rendered judgment in favor of plaintiff for $2,236.73.
 

 In this Court counsel for the defendant stated that defendant had abandoned his reconventional demand and that only the four following account items were actually contested:
 
 [6]
 

 1. Drilling Rig (“Rig Time”) ;
 

 2. Cardwell Pulling Unit;
 

 3. Monthly Salary of the plaintiff;
 

 4. Pumping Unit.
 

 Defendant urges in his brief that the district court should not have allowed plaintiff to include in his statement pro rata charges for the rig, actually furnished by defendant, nor charges- incurred prior to the agreed time at which defendant was to begin bearing his proportional share of the equipping and operating expenses.
 

 The contract, supra, between plaintiff and defendant recited that defendant would furnish a complete rig to drill the Brooks No. 1 well. In order to comply with his obligation, defendant leased from C. E. Simmons for fifteen days a “Wilson” rotary drilling rig. At the end of fifteen days the rig remained upon the land and was operated several times. Defendant states that for this use he had to reimburse C. E. Simmons some $6,750. Plaintiff’s testimony is to the effect that the “Wilson” rig remained upon the property with the consent of C. E. Simmons and that he, plaintiff, later secured a “Cardwell” unit from Mr. Simmons for operational purposes. The charge made in the lien account is for the use of the “Card-well” unit. It is listed as “Rig Time” at $124 per day.
 

 The record does not disclose with certainty the reason why plaintiff discontinued the use of the “Wilson” rig, which was rented by defendant for fifteen days. There is some testimony of record to the
 
 *516
 
 effect that a controversy existed with regard to its ownership and creditors were anxious to remove it from the premises.
 

 The record discloses that plaintiff needed and operated the “Cardwell” unit and that the charge of $124, “Rig Time” per day for twenty-four days, or a total of $2,976, was assessed after May, 1954, at which time the well was about completed and Simmons’ “Wilson” rig had been returned. There is a certificate in the record executed by C. E. Simmons to the effect that “W. H. Blasingame personally paid appearer for the use of said rig [“Cardwell”] in labor and services” and that there were no charges due Simmons by plaintiff for the use of the pulling unit.
 
 [7]
 
 Plaintiff’s testimony is to the effect that the price charged for the “Cardwell” unit was in line with that of other operators and was fair and just. This is not contradicted. Plaintiff stated that he had leased the rig from Mr. Simmons; that he paid his own labor; and that he furnished his own fuel and all supplies for the rig and its operation. The lien statement attached to the petition and appearing in the record contained no break-: down of the foregoing items. They were simply totalled under “Rig Time.”
 

 The contract, supra (paragraph 3), provides that at the end of each month plaintiff should furnish defendant an itemized statement of the
 
 cost of operation and maintenance.
 
 Under such a stipulation, it was necessary and incumbent upon plaintiff to disclose to defendant Anderson by itemized statement how much he paid to lease the “Cardwell” unit, or the value of the labor and services he rendered Simmons ; plus the cost of labor, fuel, supplies and other incidental expenses in connection with its operation. This he did not do. After proof of these expenses defendant would then have to bear 2%2sths of the total thereof, as cost of operation and/or maintenance.
 

 Under the circumstances set forth, we conclude that plaintiff’s claim for $124 per day “Rig Time” for twenty-four days cannot be considered or allowed, and his demand against defendant for his proportionate share, 2%2sths, must be dismissed as in the case of non suit.
 

 
 *518
 
 Listed as “Supervision @ $300.00 per month * * * $800.00” is plaintiff’s claim dated April 15, 1955.
 

 Defendant avers that there was no agreement between plaintiff and defendant, whereby defendant agreed to pay any fixed monthly amount to plaintiff for supervision at $300 per month.
 

 Plaintiff testified that for the charge he “ * * * furnished a pulling unit, all labor, changed pumps in the well, switched the well, shipped all oil, reported it all, operated the lease in general and besides doing all the workover such as pulling the rods and changing pumps in the well * * * that $300 per month would be $1.25 an hour for 8 hours a day. While there appears to be some duplication with regard to the “Cardwell” unit in the charge of $300 per month, it is clear that this charge is for plaintiff’s services, a part of the “servicing” mentioned in the contract, supra (paragraph 3).
 

 Defendant agreed that plaintiff should •operate the well and we believe that $10 per day is a fair and reasonable charge for his services. They were services in connection with the operation of the well and were encompassed within the scope of his authority even though payable to himself. Defendant should bear his proportionate share of 2%2sths.
 

 In his petition, plaintiff alleges that the co-owners are indebted to him for one pumping unit with F. & M. Motor purchased on January 27, 1955 — not listed in lien account, dated January, 1955 — for $800, defendant’s proportionate share being s%28ths. In addition to the cost of the unit, plaintiff demanded the cost of moving the unit from Mississippi to Louisiana, $209; $350 for “borning” pumping unit and furnishing material; $69 for setting pumping unit; $56 mileage for contracting for purchase of unit; and $162.50 for digging salt water pits and mechanic labor working on pumping unit and motor.
 

 Plaintiff admitted that he paid for the unit with an oil payment. “I swapped an oil payment for it,” he testified. He also testified that it is worth more than $800.
 

 Defendant argues that there was no agreement as to the value of the royalty interest exchanged, or the value at which the same was to be charged to the other co-owner.
 

 It is alleged that the pumping unit was purchased on January 27, 1955, and that the expenses incurred in connection therewith were contracted during January, February and March, 1955. This was a time when plaintiff was operating the well, and the agreement, supra (paragraph 3), specifically States that plaintiff or his designated agents, heirs or assigns shall operate the same. There is no stipulation that plaintiff and defendant shall confer as to the necessity to purchase, or the price of equipment; nor is,there a provision as to the method of
 
 *520
 
 payment for such equipment. The contract, supra (paragraph 3), provides that the cost of equipping the well shall be borne by the assignee in the same proportion as the cost of operation and maintenance, 2%28ths.
 

 As stated, supra, with respect to the item of “Rig Time,” we do not believe that plaintiff has sufficiently proved the value of the royalty he “swapped” for the pumping unit, or the value of the unit itself. He merely testified that he was offered a profit for the unit and that the amount of the oil payment was $800. Therefore, plaintiff’s claim for 2%28ths of the alleged price of the pumping unit ($800) will not be considered or allowed, and this demand must also be dismissed as in the case of non suit.
 

 Plaintiff has proved payment of the incidental expenses connected with the pumping unit, and these claims are recognized as valid.
 

 Having arrived at the conclusion that some of the contested claims should be allowed, we must determine whether plaintiff is entitled to a lien.
 

 “ * * * It is well recognized in our jurisprudence that liens and privileges are stricti juris and that the party who claims or asserts one must be able to put his finger on the law under which it is granted.” Grand Lodge Knights, Ladies Auxiliary, Juveniles of Honor of America v. Charles, 224 La. 785, 70 So.2d 684, 686.
 

 We are of the opinion that plaintiff has met the requirements of the lien statutes, supra, with respect to the uncontested items as well as the following enumerated items: Plaintiff rendered personal services for which he is claiming $300 per month.
 

 Plaintiff had complete control over the pumping unit and furnished and paid for material and other expenses in connection therewith, supra.
 

 We find that the “Rig Time” as listed on the lien account amounts to $2,-976, twenty-four days at $124 per day. 2%28ths of this figure amounts to $674.25. 2%28ths of the disallowed $800.00 for the pumping unit equals $181.25. The sum of these two figures equals $855.50. Subtracting this figure from the judgment of the trial court ($2,236.73), leaves a balance of $1,381.23 due to plaintiff; we, therefore, recognize plaintiff’s lien under LSA-R.S. 9:4861-2, supra, which was confirmed by the contract, supra,
 
 [8]
 
 to the extent of $1,-381.23.
 

 The trial judge did not grant plaintiff’s prayer for $50 for preparation of the lien and 10% attorney’s fees. Plaintiff has neither appealed nor complained by way
 
 *522
 
 of an answer to the appeal. It is well settled that an appellate court cannot amend a judgment in favor of a party who has neither appealed nor complained by way of an answer to the appeal. Succession of Babin, 213 La. 950, 35 So.2d 864; Betz v. Riviere, 211 La. 43, 29 So.2d 465; Corkern v. Travelers Insurance Co., 229 La. 592, 86 So.2d 205; Cox v. First Nat. Bank in Arcadia, 195 La. 963, 197 So. 616.
 

 For the reasons assigned, the claims and demands of plaintiff for “Rig Time” and the “Cardwell” unit, and the pumping unit, are dismissed as in the case of non suit; the judgment of the trial court is amended accordingly, and the amount thereof is reduced from $2,236.73 to $1,381.23, and, as thus amended the judgment is affirmed; appellee to pay the costs of this appeal.
 

 [1]
 

 . Plaintiff’s claim is really against defendant H. R. Anderson, and the use of the term “defendant” throughout this opinion shall only refer to him.
 

 [2]
 

 . “SWjé of NE% Section 32, Township 9 North, Range 2 East,” Parish of La Salle, “together with all equipment, ma- • chinery, tanks, supplies, and pipe lines including pumping equipment now on the said described leased premises.”
 

 [3]
 

 . The check to Lane-Wells Company was for $1,577.67 and the personal check to plaintiff was in the amount of $386.33. It is alleged in plaintiff’s petition that defendant owed plaintiff approximately $1,964 as of November 29, 1954.
 

 [4]
 

 . “Any person who performs any labor or service in drilling or in connection with the drilling of any well or wells in search of oil, gas, or water, or who performs any labor or service in the operation or in connection with the operation of any oil, gas, or water well or wells, has a privilege on the oil produced from the well or wells and stored on the lease whereon the well or wells are located, and on the oil, gas,, or water well or wells and the lease whereon the same are located, and on all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks, and other structures thereto attached or located on the lease, for the amount due for labor or service, in principal and interest, and for the cost of preparing and recording the privilege, as well as ten per cent attorney’s fees in the event it becomes necessary to employ an attorney to enforce collection. Any person who does any trucking, towing, or barging, or who makes any repairs, or furnishes any fuel, drilling rigs, standard rigs, material, or supplies for or in connection with the drilling of any well or wells in search of oil, gas, or water, or for or in connection with the operation of any oil, gas, or water well or wells, has a privilege on the oil, and on the oil, gas, or water well or wells and the lease whereon the same are located, and on all drilling rigs, standard rigs, machinery, appurtenances, appliances, equipment, buildings, tanks, and other structures thereto attached for drilling, equipment, and operation of the well or lease, for the amount due for such trucking, towing, barging, repairs, fuel, drilling rigs, standard rigs, material, or supplies, in principal and interest, and for the costs of preparing and recording the privilege, as well as ten per cent attorney’s fees in the event it becomes necessary to employ an attorney to enforce collection thereof. This privilege is second in rank to the privilege granted in favor of laborers.” LSA-R.S. 9:-4861.
 

 LSA-R.S. 9:4862 sets forth the time limit within which the lien must be filed.
 

 [5]
 

 .Tlie amount alleged to be owed by defendant was reduced by $226.56.
 

 [6]
 

 .Counsel’s statement in Court restricted defendant’s contestation of plaintiff’s lien account.
 

 [7]
 

 . Plaintiff’s Exhibit No. 24:—
 

 “I hereby certify that from and after May 20, 3954 I personally furnished W. H. Blasingame
 
 one
 
 pulling unit complete which was used -by him on W. H. Blasingame Flora L. Brooks
 
 ff
 
 1 Well and that W. H. Blasingame personally paid appearer for the use of said rig in labor and services rendered appearer on other well operated by appearer among which wells was the Kreli
 
 ft
 
 1, one in the Joyce Field, Winn Parish and the Muth-Lous Tullos Well at Tullos, Louisiana.
 

 “I further certify that there are no charges due me for the use of said pulling unit on the W. H. Blasingame Flora L. Brooks
 
 ff 1.
 

 “This the 25th day of March, 1955.
 

 “C. E. Simmons”
 

 [8]
 

 . “ * * * a lien * * * cannot be created by convention or contract between the debtor and creditor unless there is a statute declaring that such a contract shall
 
 create the lien."
 
 Capillon v. Chambliss, 211 La. 1, 29 So.2d 171, 176.